Good morning. May it please the Court. My name is Matthew Carvalho and I represent the petitioners Haitha and Musab al-Himri in this case. Like the case before this one, this case involves a situation in which the mother petitioner was found to be ineligible for asylum because her application was filed more than one year after her arrival in this country. The son, the IJ concluded, was not so barred because he was a minor. Also, as in the other case, the IJ failed to consider what was actually an explanation for that failure that was offered by Mrs. al-Himri, which was that her husband had timely filed an asylum application listing her and their children as beneficiaries and she thought that she was covered by that. The IJ incorrectly stated that no explanation had been given and the VIA affirmed on, in a cursory opinion, that simply affirmed on the same grounds stated by the IJ. So, in response to some of the questions asked of previous counsel, Your Honors, I would suggest that while Hakeem v. Sinus suggests that the Court has been stripped of jurisdiction to review a finding of ineligibility due to untimeliness, where the statute in effect wasn't even applied because the exceptional circumstances weren't considered, I would argue that perhaps the IJ and the VIA failed even to apply the statute that purports to strip the court of jurisdiction. And so, I'm not sure. Let's say it's a little bit different than the previous one. It is. Of the minor. Right. It is because there's a minor and it also, I think, is different because there's not really an equitable tolling argument, although you might argue that And you can get to the merits here through the minor's application. Isn't that correct? True. And, in fact, I think the Court necessarily must consider all of the merits because of the minor. Well, but that's only with respect to the minor. Are you saying there's an argument that we should consider the merits with respect to the wife, the mother? Because the court, because the IJ, the agency utterly failed to consider exceptional circumstances, I would suggest that the Court could. But the IJ did make, as the government argued in the last case, did make a determination, right, that the 1-year bar applied. I'm sorry? The IJ did make a determination that the 1-year bar applied to the wife, right? I believe that he did make such a finding, but he simply stated that no explanation had been given for any exceptional circumstances that might warrant not applying the time. But the point I'm getting at is that the government's position that if the IJ makes any kind of a determination that the 1-year bar applies, that then triggers the statutory prohibition against judicial review of ineligibility. That's true. We can't review that determination, no matter what the reason is. That appears to me to be the government's position on that. Right. And I would certainly suggest that in this case, the time bar was not applied by the IJ. It was not applied? Well, it was applied, but the statutory provision is governing what the time bar means and when it can be applied and when exceptional circumstances warrant it. What you're saying is it was applied wrongly. Exactly. It was taken, but that's exactly a decision we can't review, whether it was a mistake or not. I guess the point I'm trying to make is a little bit more subtle in that the exceptional circumstances portion of the test wasn't applied at all. And so in that... Was there a request that it be applied? Your Honor, I believe that there was. I believe that there was a colloquy between counsel for the petitioners and the IJ in one of the preliminary hearings in which it was discussed that she had believed she was covered by her husband's application and that her kids were as well. Well, all right. Then getting to the merits, assuming we can and we certainly can, as you say, at least with respect to the minor, your position is that also there was an error on the merits, right? Absolutely, Your Honor. The fundamental issue underlying the asylum and withholding claims, and I'll treat them together given that they both apply to the son, is whether past persecution was established. And the issue really is whether the exclusion and expulsion of an entire community of people from their native country constitutes persecution when that expulsion is based upon imputed political opinions. The record is clear, based on evidence submitted both by the petitioners and the government, that the Kuwaiti government systematically and programmatically... When you say exclusion, are you talking about from Kuwait? Yes. Now, what difference does that make if they're being removed to Jordan? Well, Your Honor, past persecution can be established even if the government is now seeking to deport them to a third country. I think the Andreassian case held so, and other circuits have held so as well. If you've established past persecution, the Andreassian case suggests you can't be deported to that country or to any other. And that's exactly what's happened here. I mean, you can't be deported to Kuwaiti or any other country, is that right? Right. I mean, that's what the language of Andreassian suggests. I, in this case, Kuwait, the record is clear and no one disputes that the Kuwaiti government systematically and programmatically expelled 90 percent of the Palestinian community in the 1990s. And the government's position with respect to these petitioners is that they didn't personally experience any persecution because they weren't actually physically harmed or individually targeted. That is wrong, Your Honor. They've been actually denied the opportunity to return home to the only country that they've ever lived in and the country they were born in. That is individual targeting. And to suggest that simply because they fled Kuwait during the invasion and didn't actually stay long to be deported or murdered or to experience any of the violence that the record shows a lot of their fellow Palestinians, fundamentally and functionally, it's exactly the same thing to exclude people from their home as to expel them. And, in fact, the Sixth Circuit recently held this in a virtually identical case, which the government doesn't respond to in its brief. In Uda v. IMS, the Sixth Circuit held that the mere fact that Palestinians were forced to leave Kuwait because they were perceived enemies of their country is sufficient alone to establish past persecution. The government doesn't respond to that or attempt to distinguish it or explain why this Court should split with the Sixth Circuit on that. And I would submit that this is a classic case of persecution of people. Even if it weren't found to be individual targeting of these Petitioners, however, this Court has also held that individual targeting is not necessarily required where there is a pattern or practice of persecution against the Petitioner's community as a whole. Under Hofsa and Magoyan and Osorio, where the community as a whole is targeted, the individual need not show that they themselves were targeted. Or if it doesn't rise to a level of pattern or practice of persecution, general levels of mistreatment of a community permit the Court to require an inversely high level of individual targeting on the part of the Petitioners. So regardless of which of those tests the Court were to apply, the persecution of the Palestinians in Kuwait in the 1990s was so extreme that the fact that the El Henrys didn't stay in Kuwait long enough to actually have the violence meet them personally should not mean that they haven't established past persecution, where they've been essentially stranded in the United States since 1990 with no place to go. What if we disagree with you on past persecution? Even if they're found not to have established past persecution, all of that evidence that goes to the treatment of the Palestinians in Kuwait also goes to the issue of well-founded fear of future persecution and obviously supports a well-founded fear of future persecution. You've got about a minute and a half left. Do you want to reserve it for rebuttal? Yes, that'd be great, Your Honor. Thank you. All right, then we'll hear from the government. Hello again, Your Honor. It's Leslie McCabe for the Respondent, John Ashcroft. The issue in the previous case was nexus, and the issue in this case boils down simply to whether they established sufficient harm to constitute past persecution or to give rise to an objectively reasonable fear of future persecution. And if you could just clarify the procedural posture of this case. We get to the merits through this minor example. Is that correct? Again, there are similarities, yes, between this case and the last case. The mother's application was determined untimely by the immigration judge. The son, because he was a minor at the time, did not have that untimeliness bar. So yeah, ultimately it doesn't matter. The applications rise and fall on the same facts and fall on the same dispositive infirmity, which again is the level of harm. So regarding the possible past persecution in Kuwait, it is critical that these petitioners fled Kuwait and were out of Kuwait prior to the end of the Gulf War and prior to these mass exclusions by the Kuwaiti government. And that is the distinguishing, the key distinguishing factor from the Sixth Circuit decision in Uda. In that case, the whole family was still there after the Gulf War and did experience direct harm based on the perceived political opinion of the father, I believe, in that case. So Uda is distinguishable from this case. How about future? Regarding future persecution, as Petitioner's counsel states, all the harm really kind of pulls forward. But what's key is that the country reports and the country, all of the country conditions information reflects that this period of time after the Gulf War was significant and was quite tragic, but has settled down since then. So the Kuwaiti government is going to welcome these folks back? No. No, they're not? No. That much is clear from the record. It's very likely that they will never be allowed back into Kuwait. But that alone, statelessness alone is not enough to establish eligibility for asylum or withholding of removal. It's clear that all non-Kuwaitis are treated like second-class citizens, that Palestinians are not singled out. It's also clear from the Petitioner's own expert witness that the current problem or the more recent problem in Kuwait is discrimination, harassment, and mistreatment of Palestinians rather than this widespread expulsion, torture, what have you. And the Amnesty International report supports this, that martial law ended in June of 1991. And since that time, there have been few reports of forcible expulsions and that reports of So essentially what you're looking at in Kuwait is a very difficult situation of discrimination and harassment, but that alone does not give rise to an objectively reasonable fear of future persecution under the act. One thing that's not clear to me is whether we're talking about the possibility of future persecution in Jordan or in Kuwait. As I understand it, Your Honor, it's both, either or both. And regarding Jordan, I was actually just going to get to that. The country information that we have on Jordan doesn't indicate any persecution of Palestinians. In fact, Palestinians in Jordan are treated better than in any other Arab country. They're often given full citizenship rights. Palestinians constitute, I believe, 60 percent of the population in Jordan. There are no extrajudicial or political killings reported by the State Department report in 2000. And so even if you want to look to the petitioner's claims that they have links to, I believe, the female petitioner's uncle was killed in 1971 during Black September. And you have a link with the female petitioner's niece's husband who was involved in the World Trade Center bombings. There's just no objective evidence on this record that they will be targeted by the Jordanian government on that basis. Every indication is that if they are allowed back into Jordan, they will be subjected possibly to some harassment and discrimination, again, as non-Jordanians, but that they will otherwise be. I'm sorry? What if there is a well-founded fear of persecution in Kuwait, but not in Jordan? What's the effect of that? That's an interesting question. Then you could order, if there's a well-founded fear in Kuwait, but not Jordan, you could order withholding from Kuwait and leave a removal order in effect to Jordan. Because we can, under the act, the government can remove them to either country if we could get travel documents for them. So you could prevent them from being sent to one country or the other, or both, or neither. And again, the question— If we were to disagree with the government and determine that they may be eligible for asylum based on Kuwait, are they entitled to have the Attorney General exercise his discretion regarding asylum? If you find that they're—if the record compels that conclusion as to Kuwait, yes, they would be entitled to an exercise of discretion as to that country. Just on that circumstance? Yes. And then if the Attorney General were to say, well, you know, in my exercise of looking at everything and exercising my discretion, I'm not going to grant asylum. So then the Attorney General, unless we ordered that he couldn't remove them, then the Attorney General could attempt to remove them to Kuwait. If that doesn't work, he could attempt to remove them to Jordan. To Jordan, that is correct. And in fact, there are a number of countries that we could attempt removal to, and the two at issue in this case are Kuwait and Jordan. Well, I'm puzzled by this statement in the decision of the immigration judge. It said, not surprisingly, the respondents have declined to designate any country of removal. The services asked me to designate Jordan. I will do so, but I hover no illusion that Jordan or for that matter any country is in fact likely to receive either of them. So where does that leave us? Well, Your Honor, it leaves us in a very difficult situation. The petitioners are, for all intents and purposes, stateless. They traveled on Jordanian travel documents, which is why the service requested that designation. Returning stateless aliens to any country in the Arab world is incredibly difficult at this point. And so what the immigration judge was stating was merely that we're going forward with the question of persecution in Kuwait and Jordan under the understanding that it's quite possible that they would never be ordered removed to either of those two countries. Because we would simply be unable to obtain current travel documents and get the agreements of those countries to accept them. And what's the basis for including Jordan at all? The basis for including Jordan is that they had travel documents from Jordan. And so theoretically, they could obtain travel documents from Jordan again and go back there, and they would rather not. But they don't really have any connection with Jordan at all, do they? Only to the extent that they have these travel documents. They've never lived there, and as far as I know, have never visited there. But I'm not positive on that point. But it's your understanding throughout the Arab community that they're not taking back stateless. That's my understanding based on this record, that it's just incredibly difficult and that countries are issuing travel documents. Egypt is another one that might issue a travel document to individuals. It gives them the right to travel only. It's simply a recognition by the Arab states that the Palestinians have no formal government from which to receive official documents and to allow them to travel internationally. That doesn't allow them to remain and live in? Does not give them any residence rights, typically, and may not even allow them to reenter that country. It's more simply to allow them to travel elsewhere. And again, that's just from my brief reading of the record. So what's the status of a stateless person here in the United States then? If our government cannot obtain documents to move into a third country, what's their status here in this country? Their status here would be as removable aliens. They would have that removal order. And at any point at which we could obtain travel documents, they would be subject to that order. Until that point, the government's hands are essentially tied. If we can't get travel documents, we can't remove someone. So they essentially would be in kind of a limbo. But there's no telling. The situation is very volatile in the Arab world and could change. And we could begin repatriating people there at any time, I suppose. And I see, again, that my time is running out. Are there any further questions? Can they get work permits to work in the country? In the United States? I believe so. But, Your Honor, I'm not certain about that. The government would simply request that the petition for review be denied. Thank you. All right. Thank you. Reuben? I'll just briefly respond on two points, one on the Kuwait issue and then the other on the Jordan. There's something ironic about suggesting that conditions for Palestinians in Kuwait have improved when 90 percent of the Palestinians are no longer there. That's perhaps the reason for these changed circumstances. But at any rate, this is changed circumstances, which is something that, once past persecution has been shown, can be argued by the government to rebut the presumption that the petitioners have a well-founded fear. And so, to the extent that the government would like to argue that things have changed and it's no longer as bad as it was in Kuwait, that's something that needs to be handled by the agency on remand. And I urge the Court to find that they've established past persecution and thus are entitled to- But there was no past persecution of them, was there? Well, Your Honor, I argue that forbidding people to return to the only country they've ever lived in and they were born in is a form of persecution. The reason they're not being allowed to return is because they're believed to be sympathetic to the Iraqis. Have they tried to return? Your Honor, I don't actually know off the top of my head whether they've applied for renewals, but it's well known and documented in the record that no Palestinians who are outside the country after the liberation of Kuwait have been allowed to return. So- Well, I think even the government can see that that's the official policy of Kuwait, right? Right. And so I don't think anyone would argue that they could go back. Now, on the subject of Jordan, the government does the same thing here that the IJ did, which is to focus on the fact that Palestinians in Jordan aren't subject to persecution without focusing on the actual specific reasons these petitioners fear persecution there, one of which is their relationship to a convicted terrorist. Another is the fact that the petitioner's husband has been involved in a very public and very messy asylum case in which allegations have been leveled against the Jordanian government and its treatment of people with whom he was associated. And so there are other reasons that were never even considered by the IJ, it appears, and that the government hasn't mentioned that lead these petitioners to fear persecution in Jordan that have nothing to do merely with the fact that they are Palestinians. The IJ and the government have always suggested that this is merely about ethnic conflict. It's much more than that. I mean, these petitioners are in a very unique circumstance, and the IJ didn't consider any of the specific factors supporting their application for relief from Jordan. The only thing the IJ did note was that, well, Mrs. El-Hemry's sister lives in Jordan and she hasn't had any problems. Well, for one thing, there's no evidence in the record regarding whether or not Mrs. El-Hemry's sister has had any problems. That was sheer speculation. And the second is that that would only be relevant if the sister were similarly situated to Mrs. El-Hemry, and she's not. She's not married to someone who's been involved in the asylum case that her husband's been involved in, and there's no evidence in the record to suggest that Mrs. El-Hemry's sister has ever been accused of being an associate of Nidal Ayad, who is the terrorist who's mentioned. Finally, Judge Hogg's question was, you know, what happens if they're eligible for asylum from Kuwait but not from Jordan? I think that the IJ's opinion speaks volumes when he says he harbors no illusions that they could be sent anywhere. Right. The reality is they don't have citizenship anywhere. They don't have travel documents anywhere. They are in a form of limbo. And in response to Judge Pate's question, they are nominally eligible to receive work permits, but Mr. El-Hemry's work permit has been – the application has been pending for more than a year and a half now. So as a practical matter, it appears that the government is not renewing the applications of work permits of refugees in this circumstance these days. All right. Thank you. Thank you. We thank both counsel. This case is submitted for decision. Next case on the argument calendar is Souder v. United States.
judges: Hug, Tashima, Paez